STATE OF VERMONT
SUPERIOR COURT — ENVIRONMENTAL DIVISION

|  | } |  |
|---|---|---|
| In re Sheil Material Replacement Application | } | Docket No. 249-12-09 Vtec |
|  | } | (Appeal from Montpelier DRB) |
|  | } |  |

## Decision on the Merits

Robert H. Sheil seeks the authority to replace the windows, siding, and other exterior materials on his residence at 6 Cliff Street in Montpelier. When the City of Montpelier ("City") Development Review Board ("DRB") denied design review approval for his proposed work, Mr. Sheil (hereinafter referred to as "Applicant") filed a timely appeal. The Court conducted a site visit and bench trial, which were attended by Applicant, his attorney (John L. Franco, Jr., Esq.), the attorney for the City of Montpelier (Joseph S. McLean, Esq.), and representatives of the City. The trial was completed on June 16, 2010, and the parties were afforded the opportunity to file post-trial memoranda, which were completed on August 11, 2010. This Decision is rendered to address all factual and legal issues presented by the parties.

Based upon the evidence admitted at trial, including that which was put into context by the site visit the Court conducted with the parties, the Court renders the following Findings of Fact and Conclusions of Law:

## Findings of Fact

1.     Applicant owns and occupies a single family residence on property within the City at 6 Cliff Street. He has lived continuously at this residence since he purchased it in 1987.

2.     Applicant's property is located within the High Density Residential Zoning District. Applicant's property is not far from the Vermont Statehouse, and is located near a relatively steep cliff section of the downtown area, northeasterly from the Statehouse. In fact, when one stands on the opposite side of Cliff Street from Applicant's home, one enjoys a broad view of a portion of the City's downtown.

3.     Applicant's home was constructed sometime between 1890 and 1920. It is principally a wood structure; its exterior is composed of wooden clapboards, trim, exposed rafter eves, soffit, fascia, and corner boards. The glass windows are encased in wooden frames split in two sections, the upper sash having six panels of glass and the lower sash having one panel of glass.

4.     The property also includes a two-story garage structure with similar exterior wooden features.  The work Applicant proposes to complete only involves the main residence; he does not seek authority to do any improvements on the garage structure.

5.     Several years after purchasing his property, Applicant contracted to have the exterior of his house repainted.  The paint had degraded, peeling off the wooden exterior in several places.  Applicant recalls that this work was completed in 1992 or so.

6.     The new paint began to peel off the siding several years after this work was completed.  After about eight years, the paint on the exterior of the house had peeled considerably, making Applicant's home look unkempt.  In fact, neighborhood families began to refer to this area of Cliff Street as "the haunted corner," due in large part to the condition of the exterior of Applicant's home.

7.     Applicant has not sought a detailed explanation for why the paint peeled so extensively from the exterior of his home.  There appears to be consensus, however, that interior moisture passing through the home's exterior contributes to the peeling of the paint.

8.     Applicant investigated whether an alternative siding would provide a more permanent solution to the exterior upkeep of his home.  Applicant sought out and accepted an estimate from a vinyl siding contractor to first insulate the exterior of his home and then cover the existing exterior clapboards with vinyl siding.  He selected a vinyl siding that was similar in exposed width to the wooden siding on his home, and selected a color of vinyl siding that complemented the colors of exterior siding on nearby homes.

9.     Technological advances have been made in the manufacturing process of vinyl siding to such an extent that it can be produced to match the width, appearance, and color of nearly any type of wooden clapboard siding.  The finish can be produced to replicate the grain of natural wood and can be produced in a satin finish, similar to painted clapboards.  These advances in vinyl siding production are such that, when the vinyl siding is installed properly and viewed from a distance, a casual observer may have difficulty distinguishing between it and wooden clapboards.

10.    A close inspection by even a casual observer, however, can detect that the exterior siding on a home is vinyl and not wooden clapboards.  Professional siding contractors and historians may be able to detect that siding is vinyl even without a close inspection.

11. The textured finish on vinyl siding sometimes suggests that it is vinyl and not wood. The grained surface of wood is often undetectable, particularly after wooden clapboards have been painted one or more times. Also, no matter how fine the finish of vinyl, it can be distinguished from wooden clapboards because of the overlapping seams that vinyl siding employs, the gaps that sometimes occur between the installed vinyl and the trim and corner boards, and because the vinyl siding is manufactured in sheets that include three or more rows of replicated clapboards as one piece of vinyl siding.

12. Vinyl siding is often installed over the existing wooden siding of a home, sometimes after a sheath of insulation is tacked onto the exterior of the home. Applicant's contractor installed the insulation and siding on a portion of Applicant's home in this manner. This method of installation can lead to the eventual destruction of the original wooden clapboards because the original clapboards can become splintered by the nails used to secure the insulation and vinyl siding and because moisture can become trapped between the original clapboards and new materials, leading the clapboards to rot.

13. An alternative installation process for vinyl siding results in the original wooden clapboards being removed and discarded, thereby lost forever.

14. Upkeep, maintenance, and repair of the exterior of a private residence do not often require an owner to receive design review approval from municipal authorities. However, such municipal approval may be required in the City for historically contributing properties.

15. The parties agree on certain underlying facts, and the Court so finds the following:

    a. Applicant's property is within the Design Control Overlay Zoning District ("Design Control District"). Work on certain properties within the Design Control District may only occur after design review approval has been granted by the DRB.

    b. Applicant's property also lies within the Montpelier Historic District ("Historic District"), which the City established pursuant to the National Historic Preservation Act of 1966. The boundaries for both this Historic District and the Design Control District are delineated on the City's trial Exhibit G. Applicant's property is located at approximately the center of Exhibit G.

    c. Both Applicant's home and garage are recognized as being historic and are listed as "contributing" structures in the applicable section of the National Register of Historic Places.

    d. The National Register listing of Applicant's home includes the following description: "6 (formerly 6½) Cliff Street. C. 1920. Contributing wood frame,

3

clapboarded, 2½ stories, gabled, corbelled brick chimney. This two bay front house has a double leaf French door in the east bay and a front porch with square posts and a solid clapboarded balustrade. Both the house and porch have exposed rafter eves. The windows have simple wide surrounds and six-over-one light sash. Some of them on the side facades are grouped in threes."

e. Applicant's proposed replacement of the existing windows and siding on his home requires design review approval from the DRB.

16. The City has taken several measures to promote and preserve historic structures, particularly within the historic sections of the City. In addition to establishing the Design Review District "to guide development in an area [of the City] with particular historical . . . significance",[1] the City has undertaken several studies, titled "Cityscapes," that provide reviews of and recommendations for preservation of historical structures.

17. When the Historic District was first established, the City gave notice to all then-current owners of properties with historic structures that their properties would now be subject to design review standards and a requirement to obtain design review approval prior to modification or further development of their property.

18. The City also established a Design Review Committee that is charged with making recommendations to the DRB on development proposals that impact historic structures within the Design Control District.

19. Eighty-eight percent of the 653 properties within the Historic District have been deemed to be historically "significant" or "contributing" (as determined by their respective listing on the National Register of Historic Places). No more than 91 (13%) of the historic properties have some type of replacement siding on their exteriors, be it vinyl, aluminum, or asphalt. The record presented at trial revealed that less than a handful of these 91 properties have been specifically permitted to install replacement siding by the DRB; it was further suggested that replacement siding was installed on several of these properties prior to the enactment of the applicable provisions in the City of Montpelier Zoning and Subdivision Regulations ("Regulations") relating to the Design Control District. A significant number of the remaining historic structures that have replacement siding may have had such siding installed without permit approval or other legal authority.

---

[1] City of Montpelier Zoning and Subdivision Regulations § 305.A

4

20.     One of Applicant's neighbors testified convincingly about the compatibility of vinyl siding used on several neighborhood homes with historic recognition, including her own. On one such home, the vinyl siding contractor used a router to create a channel on the existing wooden trim of the home, so that the newly installed vinyl siding could be secured inside the channel and be less likely to reveal itself as a replacement material. On another historic neighborhood home, the owner had only used vinyl siding on the sides and rear of the structure and had restored and repainted the wooden siding and trim on the front of the structure, so as to minimize the exposure of the vinyl siding from the front of the property.

21.     The City, through its Zoning Administrator, conceded at trial that there exists no "per se" prohibition on the use of vinyl siding on historically contributing structures. Concerns about vinyl siding are premised upon the non-use, destruction, or removal of historically relevant materials that comprise a building's original exterior.

22.     When Applicant sought to install vinyl siding on his home, he was unaware that his home and garage were historically contributing structures and was unaware of the need to first obtain design review approval from the DRB prior to modifying the exterior of his home.

23.     Applicant contracted with a vinyl installation contractor to install vinyl siding on the exterior of his home and to replace the windows and frames in his home with vinyl replacement windows. The new windows would have vinyl-coated frames, but would have an otherwise similar appearance as the original wood-framed windows.

24.     The existing wood-framed windows on Applicant's home are also in disrepair. In addition to peeling paint, they had become loose and drafty through the years. They were of the older variety, having lead weights inside the frames that operated to balance the window sashes. Many of the leaden weights had detached from their harnesses, thereby making the windows more difficult to operate. The original windows were also of the single pane variety and were therefore inefficient insulators from the outside elements. A prior owner had installed aluminum storm windows which had no historical significance and detracted from the historical attributes of the original windows and exterior siding.

25.     The new vinyl windows would be of the double pane variety, would be energy efficient and weather resistant, and would not require the use of separate storm windows. Applicant does not wish to use storm windows on his home.

26. The contractor began his work on Applicant's home in August of 2009. In connection with this work, the contractor removed the pre-existing aluminum storm windows and some of the distinctive trim elements around the exterior of the windows, installed ¾ inch, foil-backed insulation on part of the exterior of the home, and began installing the vinyl siding over the insulation and original wooden clapboards.

27. Shortly after work began, the Zoning Administrator was made aware of this work and advised Applicant that he must first obtain design review approval from the DRB before work could lawfully continue. Applicant immediately directed his contractor to suspend work.

28. On August 26, 2009, Applicant submitted his application for design review approval to the DRB. His application included a general summary of the vinyl replacement work to be done. A copy of the application was admitted at trial as Applicant's Exhibit 1.

29. The DRB first referred Applicant's application to the Design Review Committee ("DRC"), which, by decision dated September 15, 2009, recommended that the DRB deny Applicant's request for approval. A copy of the DRC's decision was admitted at trial as City's Exhibit B.

30. The DRB conducted a public hearing on Applicant's application on November 2, 2009, after which the DRB voted to deny Applicant's request. The DRB issued its written decision on November 11, 2009,[2] and Applicant filed a timely appeal with this Court.

**Discussion**

The principal legal issue presented here concerns whether Applicant's proposed modifications to the exterior of his historically contributing home satisfy the design review criteria presented in this appeal. Before addressing that substantive legal issue, we must first address several procedural and jurisdictional issues presented by the parties.

## I.     Procedural Challenges

First, we address the City's request that it be permitted to submit its memorandum in reply to Applicant's post-trial memorandum. Applicant has offered no specific response to the City's request, and we find no reason to deny it.

At the close of the evidence at trial, the Court responded to Applicant's various offers to make modifications in his proposed work by directing Applicant to specify the plan

---

[2] See City's trial Exhibit A.

6

encompassed by his application. In response, Applicant filed his "Post Hearing Memorandum" with the Court on July 15, 2009. The City filed its Reply on July 26, 2009, which the City then sought permission to file by a motion and memorandum of August 11, 2009.

While the better practice would have been for the City to submit its request to make an additional filing before, or at least simultaneous to making the additional filing, we conclude that fairness requires that the City's additional filing be allowed. The City is correct that Applicant suggested a revised work plan for the first time in its Post Hearing Memorandum, although we note that each component of Applicant's revised plan was based upon testimony or other evidence presented at trial. The City's additional filing was the first opportunity the City had to respond to Applicant's revision.

The Court frowns upon multiple post-trial filings, since they cause the Court to delay its consideration of the merits of an appeal. As more time passes, recollections fade, and the Court is required to more heavily rely upon its trial notes. When the parties make no post-trial filings, a case goes under advisement immediately after the trial. The undersigned has worked to shorten the time during which merits determinations remain under advisement in this Court. Encouraging parties to limit their use of, or the time in which they make, post-hearing filings is one vehicle that the Court has used to help shorten the under-advisement timelines. Nonetheless, we conclude that the City's request to make its additional filing of July 26, 2010 should be **GRANTED** and have reviewed the City's additional filing in the course of our determinations here.

The next procedural issue raised by the City provides a more problematic question: whether Applicant limited the scope of his appeal in such a manner so as to limit the scope of the Court's review of his application in this appeal. We begin our analysis with the general premise that this Court only enjoys jurisdiction over the legal and factual issues that an appellant has properly preserved for our review. See V.R.E.C.P. 5(f) ("The appellant may not raise any question [i]n the appeal not presented in the statement [of questions] as filed, unless otherwise ordered by the court in a pretrial order entered pursuant to subdivision (d) of Rule 2."). In a specific reference to Rule 5(f), our Supreme Court noted both the general rule that our review of a land use appeal is "confined to the issues raised in the statement of questions" and that our review must also consider "matters intrinsic" to the legal issues raised by an appellant in their statement of questions. In re Appeal of Jolley Assocs., 2006 VT 132, ¶ 9, 181 Vt. 190. With this

directive in mind, we review the Statement of Questions filed here in relation to the DRB Decision that was appealed. For the reasons stated below, we conclude that Appellant's Statement of Questions, while unartfully drafted, encompasses the scope of the DRB's denial.

First, we review the specific language of Applicant's Statement of Questions, which in total states as follows:

1) Is the use of vinyl siding and/or windows at 6 Cliff Street in the City of Montpelier compatible with other properties in the [Design Control D]istrict under Montpelier Zoning and Subdivision Regulation No. 305.F.3; and

2) Does the use of vinyl siding and/or windows at 6 Cliff Street constitute the use of incompatible exterior materials under Montpelier Zoning and Subdivision Regulation No. 305.F.5?

A review of the November 23, 2009 DRB Decision from which Applicant appeals quickly reveals the source of the City's concern and challenge, since the DRB entered a specific finding that the DRC, in its recommendation to the DRB, "found [Applicant's proposal] to be *unacceptable* under § 305.F applicable criterion 1, 2, 3, and 5." (City's Ex. A at 2, Findings and Conclusions ¶ 3 (emphasis in original)). Thus, it would appear that Applicant only appealed two of the four legal criteria the DRB relied upon in denying the pending application.

Were we to adopt the City's analysis we would be compelled to rule that the pending application must be denied as a matter of law, no matter what credibility we assign to the evidence presented at trial, since Applicant would now be prohibited from challenging two of the four rulings below. See 24 V.S.A. § 4472(d) (an interested person who fails to appeal a decision by an appropriate municipal panel "shall be bound by that decision . . . and shall not thereafter contest [that decision], either directly or indirectly"). However, the DRC's recommendation, as found by the DRB, is somewhat unclear, as the DRB Decision does not specify how the DRC found the pending application deficient under each of the four criteria it cites. More important, the DRB's own conclusions (see City's Exhibit A at 2, Findings and Conclusions) similarly lack specificity and provide no more detail. In short, the DRB Decision contains no distinction between the four cited criteria from Regulations § 305.F[3] and provides no guidance to the Court

---

[3] Regulations § 305.F contains eight subsections. The subsections cited by the DRC in its recommendation state the following:

305.F. Review Criteria.

The Design Review Committee and Development Review Board shall evaluate [a proposed] design review plan based on the following considerations:

concerning what aspects of Applicant's vinyl siding proposal violated each of the four cited criteria. We are left to conclude that the DRB found that Applicant's vinyl siding and window proposals violated the four cited criteria collectively and without distinction.

Applicant's Questions specifically cite only to subsection 3 and 5 of Regulations § 305.F, and to the "incompatibility" standard referenced in those criteria. However, we are at a loss to determine the distinction between the standards of those criteria and the standards of subsections 1 and 2: we cannot discern a distinction between whether Applicant's proposal contains either an "appropriate historic style" and is in "harmony of exterior design with other properties in the district" (the standards in criteria 1 and 2) from whether its "exterior materials" and "designs" or "color schemes" are compatible with other properties in the Design Control District, which are the standards we are required to employ under criteria 3 and 5. The DRB Decision provides us with no guidance, since it provides no distinction between these standards. We are left with standards that are difficult to differentiate.

Applicant first presented his legal issues in the Notice of Appeal he filed pro se with the Court on December 22, 2009. While his Statement of Questions was filed after he retained Attorney Franco to assist in the prosecution of his appeal, the Statement of Questions Attorney Franco filed are a mirror recitation of the issues Applicant first posed in his self-represented filing. Applicant testified at trial that he focused his appellate Questions on the legal issue he understood was substantively at issue: compatibility. We fear that granting the City's request, while well founded in a general reading of the applicable legal standard, would ignore the lack of specificity in the DRB Decision and may well cause Applicant to suffer an unfair disadvantage due to his then-status as a self-represented litigant. We therefore decline to grant the City's request and precede to our review of the conformance of Applicant's proposed vinyl replacement plan with the applicable criteria from Regulations § 305.F

---

1. Preservation or reconstruction of the appropriate historic style if the proposed project is in the historic district or involves an historic structure;

2. Harmony of exterior design with other properties in the district;

3. Compatibility of proposed exterior materials with other properties in the district;

. . . ;

5. Prevention of the use of incompatible designs, buildings, color schemes, or exterior materials;

. . . .

**II.     Do Applicant's Vinyl Materials Conform to Regulations § 305.F.1, .2, .3 & .5?**

Any proposal to use replacement materials on the exterior of a structure, especially one that has been acknowledged as historically significant or contributing, often presents similar legal issues that cause consternation for the property owner and town officials.  In the two appeals concerning replacement exterior siding over which the undersigned has most recently presided,[4] a similar set of facts were presented as are presented in the appeal here: that the property owners had become dissatisfied with the process of repainting wooden clapboards because it frustrated their efforts to maintain their property.  The suggestion had been made to these property owners that an alternate form of exterior siding, such as vinyl siding, would help maintain the exterior of their property for a longer period of time, and at less expense than repeatedly repainting wooden clapboards.  Thankfully, we are not charged in this appeal with determining which exterior material lasts longer or works more efficiently to preserve a home.  Instead, our charge here is limited to determining whether Applicant's proposed replacement materials conform to the applicable criteria in Regulations § 305.F.  The City correctly notes that whether other replacement siding materials conformed to ordinance provisions from other municipalities has little precedential force upon the legal question posed in this appeal.

The City has expended significant efforts and municipal resources to preserve the historic nature of its downtown.  The fact that Montpelier is the capital of our State and host to many historic facilities, including the Vermont Statehouse, adds to the importance of the City's efforts.  Some municipalities have proclaimed the importance of their historic structures or downtown areas, but then have not been vigilant in their efforts to maintain those historic structures or regularly require owners to preserve the original exteriors of their buildings.  See, e.g., In re Appeal of Hartman, No. 81-4-02 Vtec (Vt. Envtl. Ct. Oct. 10, 2002) (Norton, J.).  In the present appeal several examples of the City's specific efforts to preserve historic structures were discussed, including the implementation of design review, the use of the DRC to review renovation plans and make recommendations to the DRB, and two district-wide "Cityscape" studies to provide review and recommendations for historic preservation.  The results of the City's efforts are demonstrated by some of the unrefuted evidence presented at trial, including that the use of replacement exterior materials on only a few historic structures has been approved

---

[4]  See In re Armour Siding Application, No. 134-7-05 Vtec (Vt. Envtl. Ct. Dec. 18, 2006) (Durkin, J.) and In re ALPH Realty, Nos. 30-2-08 Vtec, 31-2-08 Vtec, and 32-2-08 Vtec (Vt. Envtl. Ct. Jan. 30, 2009) (Durkin, J.).

by the DRB, and the fact that only 13% of historic buildings in the Historic District no longer maintain their original exterior materials. The Court applauds the City's efforts at historic preservation.

However, we cannot interpret the applicable criteria in Regulations § 305.F as absolutely prohibiting the use of vinyl siding materials. The City's Zoning Administrator conceded this point when he admitted that no provision of the Regulations can be read as a "per se" ban of vinyl as an exterior replacement material. While the Court was only presented with three or fewer examples of prior DRB approvals of the use of replacement siding, we concur with the Zoning Administrator's assessment that the Regulations do not establish an outright prohibition. Thus, we conclude that, when appropriately designed, vinyl may be allowed under Regulations § 305.F as a replacement material on Applicant's home.

We reach this conclusion with an acknowledgement that the Regulations cannot be interpreted in isolation. Applicant has struggled to find an appropriate way in which to preserve the exterior of his home. The Court found convincing the trial testimony of some of Appellant's neighbors that his home, in its current condition of peeling paint on wooden clapboard, is in conflict with the character of their immediate neighborhood.

We found the vinyl samples Applicant presented at trial to have a similar finish and color scheme of well-kept historic homes in his immediate neighborhood. Applicant's proposal to leave the original wooden clapboards in place, covering them over with insulation and vinyl siding, will result in some damage to the clapboard from the nails used by the vinyl contractor, but at least the original clapboards will not be completely lost through disposal. In fact, with certain amendments to Applicant's plan that we have incorporated into our review, we have concluded that the careful, well-planned use of vinyl siding and vinyl replacement windows will allow for the historic preservation of Applicant's home.

Regulations § 305.F provides specific criteria by which we are to review Applicant's proposed design plan. When read together, which we find appropriate because of the overlapping language and phrasing in the subsections the DRC determined to be applicable, we understand that the collective criteria applicable in this appeal is whether Applicant's plan incorporates "preservation or reconstruction of the appropriate historic style" by being compatible and harmonious in its design, materials, and color schemes with other properties in the Design Control District. See Regulations § 305.F.1, .2, .3, and .5.

11

The evidence presented convinced the Court that the vinyl siding and windows Applicant plans to employ are sufficiently similar to the original materials on his home so as to conform to the collective criteria under Regulations § 305.F. In fact, to a significant degree, the new materials will appear nearly identical to the casual observer. The fact that the original materials will, to some extent, be preserved underneath the new materials has factored into our conclusions, although we share the City's concerns that the stapling or nailing of insulation and vinyl siding could cause significant damage to the original siding.

We also wonder why no party has suggested that Applicant preserve a portion of the exterior siding, both to preserve the historic significance, and to verify the compatibility and harmony of the new materials. The Court recalls testimony of this approach being employed on at least one historic home in the City and recalls a similar approach being employed in at least one other vinyl siding appeal. See In re Appeal of Hartman, No. 81-4-02 Vtec (Vt. Envtl. Ct. Oct. 10, 2002) (Norton, J.). We will therefore impose such a condition, having concluded that this condition will bring about more assurance of the project's conformity with § 305.F.

The most troubling challenges to the historic qualities of Applicant's home are that (1) some of the exterior wood window trim has already been removed from the building and (2) the gaping that occurs when vinyl meets wood trim on the exterior of a building often reveals that vinyl has been employed. Applicant has offered to replace, preserve, and repaint all wood window trim, and we will so condition our approval. Lastly, while Applicant did not specifically offer to channel the wood window trim and corner boards on his home that will abut the vinyl, he offered the testimony about this procedure by one of his neighbors, which we found convincing and beneficial from the perspective of compatibility and harmony. Thus, we have also conditioned our approval by requiring Applicant to employ similar techniques.

Lastly, we note that as the presiding judge, the undersigned is charged with rendering a final judgment in this dispute, and has sought to fulfill that charge. But a judge presiding over a bench trial who is a stranger to this neighborhood and who is not well versed in its historical significance does not have the full capabilities of Applicant, his neighbors, and City officials to envision even better methods for attaining compliance with the Regulations while affording Applicant an opportunity to effectively maintain his property. One such reality that we leave unanswered, since Regulations § 305.F does appear to authorize this Court to address it, is whether Applicant needs to remedy a moisture or ventilation problem at his home so that the

application of vinyl does not become as disappointing as Applicant's first attempt at repainting the wooden clapboards.

We have concluded that the conditions imposed here allow Applicant's proposed work to conform with the applicable § 305.F criteria, thereby rendering the conditions appropriate under 24 V.S.A. § 4464(b)(2). If our determination is not successfully challenged and becomes final, it will become a final judgment. Nonetheless we encourage the parties to investigate whether even more appropriate and acceptable conditions may be imposed. If the parties reach an agreement on more appropriate conditions, the Court will entertain a joint motion to amend this judgment. Regardless of whether the parties choose to have such discussions, the Judgment Order that accompanies this Decision concludes these proceedings unless and until a subsequent order is entered.

## Conclusion

Thus, for all the reasons detailed above, the Court does hereby **APPROVE** Applicant's proposal to install vinyl siding and replacement windows on his historic home at 6 Cliff Street in the City of Montpelier, subject to the following conditions:

1. The vinyl siding to be used shall mirror the exposed reveals of the original clapboards and be of the same color as presented at trial, so as to be harmonious with the color schemes of surrounding properties;

2. Applicant shall preserve and replace, where necessary, the wooden clapboards on the front of his home and repaint the front clapboards, trim, and corner boards in a color scheme identical to the colors employed on the other sides of his home, so as to preserve the historic integrity of the appearance of his home from Cliff Street;

3. Vinyl replacement widows may be installed on all sides of Applicant's home, including the front, conditioned upon all wood trim around the windows being preserved and replaced where necessary and painted in a color scheme that is harmonious with the surrounding properties and compatible with the color scheme of Applicant's siding, as Applicant represented at trial;

4. Applicant shall cause the existing and replaced wooden trim and corner boards to be routed in such a manner so as to allow the vinyl sheets to fit within the routed wood and make the vinyl less likely to reveal its character as a replacement material.

5. Applicant, his successors, and assigns shall maintain the installed siding and repair or replace any defects, cracks, peeling paint, or broken panels that materially detract from its appearance.

13

This completes the current proceedings in this Court concerning this appeal. A Judgment Order accompanies this Decision.

Done at Berlin, Vermont this 19th day of October, 2010.

_____

Thomas S. Durkin, Judge